IN THE UNITED STATES DISTRICT COURT FOR

THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

     vs.                               CRIMINAL NO. 09-865 JB

CAROLYNNE TILGA and
MICHAEL CHANDLER,

        Defendants.

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America hereby files its Sentencing Memorandum as to defendants Carolynne Tilga and Michael Chandler.  Sentencing hearings for these defendants are currently scheduled for October 13, 2011.  The government submits this memorandum for the purpose of explaining how the loss amount in this case (which is used to calculate, in part, the advisory guideline offense level) was determined, and for the purpose of stating its position as to the sentences to be imposed.  For the reasons stated below, the Court should give effect to the stipulation of the parties as to the loss amount, and should impose sentences consistent with the government's request.

## Factual Background

A.  The Indictment

By an Indictment filed April 9, 2009, a federal grand jury charged defendants Carolynne Tilga and Michael Chandler with a *Klein* conspiracy to defeat the

administration of the tax laws of the United States during the period 1998 to 2006 in

violation of 18 U.S.C. § 371, and with tax evasion for the years 1999 to 2004 in violation

of 26 U.S.C. § 7201.[1]  The Indictment described defendant Tilga's ownership interest in

various Internet pornography sites, and her earning substantial income from these Internet

sites.[2]  The Indictment went on to describe how defendants took steps to conceal a

significant amount of this income by their purchase and use of approximately ten bogus

"trusts," sold to the defendants by Commonwealth Trust Corporation, a firm that

purported to counsel wealthy individuals on how to defeat their tax liabilities.

The Indictment further described the defendants' concealment of income in the

bogus "trusts," and their exercise of dominion and control over the "trusts" in order to

purchase real property and motor vehicles.  For example, the Indictment alleged that, on

September 10, 1998, the defendants caused $186,982.50 in Internet pornography income

to be wire transferred from the off-shore bank account of a "trust" called Cabernet

Financial in order to purchase a home in Taos Ski Valley.  Indictment at ¶ 22.  The

Indictment described a series of similar fund transfers, totaling approximately

---

[1]  The Indictment charged a third defendant, Helen Geer, with the *Klein* conspiracy and with filing false tax returns in violation of 26 U.S.C. § 7206(1), but the Court dismissed all charges against her upon the government's motion on grounds of her physical inability to participate in her own defense at trial.

[2]  Although the Indictment does not specify the country of origin of defendant Tilga's Internet pornography income, the IRS's investigation had determined that this income was earned in Canada.  The foreign source of the income stream was critical to the plea agreements in this case, as further described below.

$4,527,318.50, which are listed in tabular form at ¶ 20 of the Presentence Report (hereinafter the "PSR").  The gravamen of the Indictment was that these funds constituted income to the defendants, that the defendants had conspired with others to defeat the administration of taxes on these funds, and that the defendants had committed affirmative acts of evasion in an effort to avoid paying lawful income taxes on these funds.

      B.     <u>Tilga's Theory of Defense and Preparations to Assert Defense at Trial</u>

In post-Indictment discussions with government counsel, Tilga's attorneys asserted a technical tax law defense to the criminal charges.  They argued that Tilga was entitled, at any time before trial, to pay taxes to the Dominion of Canada on Tilga's Canadian-source income for the years covered by the Indictment.  They further argued that the Internal Revenue Code permitted Tilga to file amended U.S. tax returns claiming foreign tax credits for each of the same years, limited only by a special ten-year statute of limitations that applies to filing for foreign tax credits.[3]  Because Canadian taxes are so much higher than U.S. taxes, Tilga's attorneys argued that the foreign tax credit would more than wipe out the U.S. tax deficiency.  They went on to argue that this course of action would entitle them to acquittal on the evasion charges, as a tax deficiency is one of the elements of evasion.[4]

---

[3]  The relevant portions of the Internal Revenue Code are codified at 26 U.S.C. §§ 6511(d)(3) and 905(c)(2)(B), which are discussed at greater length below.

[4]  This defense theory is summarized in the PSR at ¶¶ 31-33.

In August 2009, consistent with her counsel's theory, Tilga filed tax returns in the Dominion of Canada for business income earned in each of the years 1999 through 2004. Tilga did not pay Canadian taxes on this income, but simply filed the returns. The Canadian government provided this information to the IRS in April 2010, pursuant to a bilateral tax administration agreement.[5]

Also consistent with her counsel's theory, on April 15, 2010, Tilga attempted to file a notice of claim with the IRS, stating that she was entitled to a credit on her 1999 returns for taxes owed to the Canadian government for that year. Given the ten-year special statute of limitations applicable to foreign tax credits, Tilga filed this notice of claim on the last possible day (ten years from the due date for 1999 returns).[6] The notice of claim was hand delivered to the IRS office in Miami, Florida, by defense counsel. The IRS accepted the notice, but did not consider the notice to have been "filed," and did not process it.

The expectation of all counsel in this case was that, had this case proceeded to

---

[5] As set out in the PSR and Tilga's sentencing memorandum, the Canadian Revenue Agency sent Tilga a notice on November 19, 2010, stating in substance that she owed CAN$7,424,514.40 in taxes on her Canadian income. PSR at ¶¶ 82-83; Memorandum in Aid of Sentencing of Defendant Carolynne Tilga [Doc. 161] at 9, fn.19. The amount of Tilga's foreign tax liability was accordingly determined before trial. *Compare*, *United States v. Cruz*, 698 F.2d 1148, 1152 (11th Cir. 1983) (defendant in tax evasion case could not claim foreign tax credit wiped out U.S. tax deficiency because foreign tax liability had not been determined before trial).

[6] Under her own counsel's theory, the farthest that Tilga could reach back by 2010 would have been the 1999 tax year, given the ten-year limitations period for filing notices of claim or amended returns reflecting credits for tax payments to foreign countries. By 2010, it was (again, on her own theory) too late for Tilga to make any claim as to the 1998 tax year. This fact was to be of significance to the determination of the stipulated tax loss, as explained below.

trial, Tilga would by time of jury selection have paid her Canadian tax liabilities for the years 1999 to 2004, and would have filed (or attempted to file) notices of claim or amended returns in the United States asserting the foreign tax credits for each of these years.  Tilga's lawyers consistently told the government, however,  that rather than attempt to defeat the prosecution through aggressive use of the foreign tax credit, they would prefer to reach an agreement under which Tilga would plead guilty to a felony tax charge, would have a hope of limiting her sentencing exposure, would pay her U.S. tax deficiency for the years covered by the Indictment, and would also come current on her U.S. tax obligations for the years since 2004.

      C.      The Plea Agreements

On January 6, 2011, the United States entered into plea agreements with defendants Tilga and Chandler, under the terms of which each defendant agreed to plead guilty to the *Klein* conspiracy in satisfaction of all charges.[7]  The agreements were made pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, such that the stipulations contained in the agreements were not binding upon the Court.  Each plea agreement contained a statement of factual basis in support of the defendant's guilt, a series of stipulations, and (particularly in Tilga's case) a substantial set of additional obligations imposed upon the defendant.  The plea agreements were also interlocking, in that the Chandler plea agreement was predicated in part upon the loss amount stipulated

---

[7]  The *Klein* conspiracy was the "major count" of the Indictment for Department of Justice Tax Division policy purposes.  Tax Division policies require United States Attorney's Offices to dispose of tax cases upon pleas to the major count only, absent Department permission to the contrary.

in the Tilga plea agreement.

1.    The Tilga Plea Agreement[8]

In her plea agreement, Tilga admitted most of the salient facts alleged in the

conspiracy count of the Indictment.  She admitted, *inter alia*, that she had earned

significant income from her Canadian business ventures, that she had purchased the

Commonwealth Trust Corporation ("CTC") entities identified in the Indictment as a

means of shielding her income from taxation, that she directed the Canadian businesses to

distribute her share of the revenues to one of the CTC entities, and that she moved the

money to other CTC entities for purposes of purchasing the real properties and vehicles

alleged in the Indictment.  Carolynne Tilga Plea Agreement [Doc. 126], filed January 6,

2011, at ¶¶ 8(a)-(g).  Tilga went on to admit that she had not reported this money on her

United States income tax returns nor paid income taxes on it, and that she had entered

into an agreement with personnel of Commonwealth Trust Corporation "with the intent to

conceal [her] Canadian source income and the intent to defraud the United States."  *Id.* at

¶ 8(h).

Tilga's plea agreement required her to file amended U.S. tax returns not only for

the years covered by the indictment, that is, 1998 to 2004, but also for the years 2005 to

2009.  *Id.* at ¶¶ 13-14.  She agreed that she would pay all taxes due and owing upon her

1998 through 2004 returns by the date of her sentencing hearing, and that this amount

---

[8]  The present summary is not intended to be a full recitation of the contents of the Tilga plea agreement.  To the extent that this summary varies in any way from the plea agreement, the terms of the plea agreement itself should govern.

would be at least $1,735,025.00.  *Id.*  She further agreed to make her best efforts to file

her amended 2005 to 2009 returns, and to pay all taxes due upon them, by the date of the

sentencing hearing.  Moreover, Tilga agreed to cooperate with the civil audit processes of

the Internal Revenue Service, which she acknowledged not to be bound by the returns that

she files, and which she further acknowledged retains its full authority to determine her

tax liability as well as applicable interest and penalties.  *Id.* at ¶ 15.

The plea agreement also included the following stipulation as to the loss amount:

10.  The United States and the Defendant stipulate as follows:

a.  For purposes of the advisory United States Sentencing Guidelines, the tax loss for the tax year ending on December 31, 1998, was $23,200.00.

b.  The Defendant believes in good faith, relying on the advice of experienced and skilled tax counsel, that she has a foreign tax credit available to her under Title 26, United States Code, Sections 901 and 6511 and applicable regulations, for taxes accrued or actually paid to a foreign country, and that such foreign tax credit would eliminate her liability for federal income taxes in the United States of America for the remaining years of the conspiracy to which the she is pleading guilty, that is, the tax years ending on December 31, 1999,  through December 31, 2004, inclusive.  The Defendant has elected to forego pursuit of the foreign tax credit and instead pay federal income taxes that may be due and owing in the United States of America.  The government does not agree with the Defendant concerning the availability and/or applicability of such foreign tax credit on the facts of the present case, as the Defendant has not actually paid the foreign taxes.  The government agrees, however, that the Defendant's decision to pay United States income taxes should not put her in a worse position for purposes of calculating her relevant conduct under the advisory United States Sentencing Guidelines than had she paid the foreign taxes.  The parties accordingly stipulate, for relevant conduct purposes, that the tax loss from the conspiracy to which the Defendant is pleading guilty is limited to the $23,200.00 set out in ¶ 10(a), above.

*Id.* at ¶ 10(a)-(b).  The plea agreement accordingly contemplated that the loss amount for

7

guideline purposes would be $23,200.00, as opposed to the full amount of taxes that Tilga owed for the period 1998 to 2004 (which, as discussed above and as set out in the plea agreement at ¶ 13, was believed by the parties to be at least $1,735,025.00).  As will be further set out below, the United States entered into this non-binding stipulation to a vastly reduced loss amount upon consideration of the strength of the evidence, the steps taken by the defendant to make aggressive use of the foreign tax credit as a means of defeating the prosecution, and the legal requirement of proving a tax deficiency as an element of an evasion case.

Tilga's plea agreement also contained a waiver of appeal and a limited waiver of collateral attack upon her conviction pursuant to 28 U.S.C. § 2255.

2.    The Chandler Plea Agreement[9]

Chandler's plea agreement provided for his plea of guilty to the *Klein* conspiracy in satisfaction of all charges.  Michael Chandler Plea Agreement [Doc. 128], filed January 6, 2011.  His agreement too contained a written factual basis and a series of non-binding stipulations.  Chandler and the government stipulated that he should be entitled to the benefit of the same loss amount stipulation that had been made in the Tilga plea agreement.  Chandler Plea Agreement at ¶ 9(a).  The parties further stipulated that Chandler was entitled to a reduction of two offense levels for acceptance of responsibility, and a four level reduction for minimal role in the offense.  *Id.* at ¶¶ 9(c)- (d).  Chandler also agreed to a waiver of appeal and a limited waiver of collateral attack

_____

[9]  As with the Tilga plea agreement, any inconsistency between this summary and the Chandler plea agreement is to be governed by the terms of the agreement itself.

upon his conviction.  *Id.* at ¶ 19.  The United States agreed that, with respect to any fine to be imposed upon Chandler, it will recommend that the Court consider Chandler's role in the offense and the extent to which he has any independent income or independent sources of wealth.  *Id.* at ¶ 21.

D.     Post-Plea Agreement Conduct

To the best of the government's knowledge, the defendants have been fully compliant with the terms of their plea agreements in the months since the agreements were signed.  In particular, Tilga has not only been fully compliant with the additional obligations she undertook, but has done more than the plea agreement required of her by the date of the sentencing hearing.  As noted in the PSR at ¶ 35, on March 31, 2011, Tilga filed amended tax  returns for the entire period from 1998 to 2010.  She made total payments of approximately $3.3 million, of which approximately $1,937,273.00 represented taxes due for the period covered by the Indictment.[10]  These payments represent what Tilga believes to be all payments due and owing, including her calculations of applicable interest and penalties.  As previously noted, the Internal Revenue Service is not bound by Tilga's calculations and will make its own assessment as to whether additional funds are due.

_____

[10]  Tilga apparently paid $1,937,273.00 in taxes for the years 1998 to 2004, PSR at ¶ 35, notwithstanding the fact that she may have been in compliance with the plea agreement even had she only paid 1,725,035.00.  *See* Tilga Plea Agreement at ¶ 13.

## ARGUMENT

### I.      The Court Should Accept the Stipulated Loss Amount

The non-binding stipulated loss amount in this case was the result of lengthy, intensive negotiations between the parties.  The government's decision to enter into the stipulation was the product of its review of the strength of its case, of the defendants' preparation to make aggressive use of the foreign tax credit as a means of attempting to defeat the prosecution, and of the requirement that the government prove a tax deficiency as an element of tax evasion.  The stipulation was not lightly entered into, and by no means stands for the proposition that the government can simply choose whatever loss amount it wishes in a tax case (or indeed in any other kind of case).

This Indictment in this case charges tax evasion and conspiracy to commit tax evasion.  The elements of tax evasion are (i) a deficiency, (ii) an affirmative act of evasion, and (iii) willfulness.  *Sansone v. United States*, 380 U.S. 343, 351 (1980). Tilga and her counsel proposed to use the foreign tax credit as a means of attacking the government's proof of the first of these elements: if she were entitled to the credit, it would have offset her tax bill on a dollar-for-dollar basis.  As Canadian taxes are imposed at a higher rate than U.S. income taxes, the credit, if allowed, would have wiped out Tilga's tax deficiency.  *Compare*, *United States v. Cruz*, 698 F.2d 1148, 1150-51 (11th Cir. 1983) ("In this case, Cruz sought to strike against the very heart of the government's tax fraud case.  Instead of concentrating on the willfulness element, as is usually the situation,

Cruz attacked the tax deficiency utilizing [the sections of the Internal Revenue Code

implementing the foreign tax credit]").

It is the position of the United States that a taxpayer cannot defeat a tax

prosecution by amending her returns post-Indictment, or by calling an expert witness at

trial to testify that, had an alternative means of calculating the tax been used, there would

have been no deficiency.  *See, generally, United States v. Helmsley*, 941 F.2d 71, 86-87

(2d Cir. 1991); *Fowler v. United States*, 352 F.2d 100 (8th Cir. 1965).  The general rule is

that a taxpayer may not avail herself of a change in accounting methods without the

consent of the Commissioner of Internal Revenue.  *See, United States v. Kleifgen*, 557

F.2d 1293, 1297 n.9 (9th Cir. 1977); *Witte v. Commissioner*, 513 F.2d 391, 394 (D.C. Cir.

1975).  The cases establishing this principle arise in the context of a taxpayer's election of

a depreciation method.

> The law could hardly be otherwise.  If it were, evaders with
> complicated returns would be allowed to evade taxes on one
> portion of their return while using a depreciation period that
> would be the most profitable in the long run if the evasion
> went undetected.  If the evasion were uncovered, then they
> would need only to recalculate under a shorter depreciation
> period that would increase deductions for the years in which
> evasion is charged.

*United States v. Helmsley*, 941 F.2d at 86-87.

The matter appears to become more complicated, however, in the instance of the

foreign tax credit.  The Internal Revenue Code specifically provides for the filing of claim

for a credit or a refund for taxes paid or accrued to a foreign country at any time until ten

years from when the return was originally due.  *See Hart v. United States*, 585 F.2d 1025

11

(Ct. Claims 1978), *construing* 26 U.S.C. § 6511(d)(3)(A).[11] In a case in which a

defendant charged with tax evasion attempted to make use of an as-yet unclaimed foreign

tax credit in order to show that he had no tax deficiency, the Eleventh Circuit did not cite

to the *Helmsley* line of cases referenced above, but nor did it follow similar reasoning, but

found only that the prosecution accelerated the time in which the taxpayer could exercise

the right to fix the amount of the foreign tax liability and claim the foreign tax credit.

*United States v. Cruz*, 698 F.2d at 1152.

The question presented on appeal in *Cruz* was whether the trial court committed

error by giving the following jury instruction:

> For a foreign tax credit to accrue under United States tax laws
> you must find that with regard to the foreign tax all events
> have occurred which fix the amount of the tax and determine
> the liability of the taxpayer to pay it. That is, you must find
> that the foreign government is aware of the income that is
> taxable in their country; that the foreign government has
> computed the tax due on that income, and that the Defendant
> has acquiesced to or failed to contest that amount of tax due
> to the foreign government.

*Id.* at 1150. The defendant in *Cruz* defended himself at trial by asserting that he was

entitled to an as-yet unclaimed foreign tax credit that would wipe out his tax deficiency,

and that, although he had not yet taken steps to pay the foreign tax, his ten-year period for

filing his claim for a credit under U.S. tax laws had not yet expired. The Eleventh Circuit

---

[11] 26 U.S.C. § 6511(d)(3)(A) reads in relevant part as follows: "If the claim for credit or refund relates to an overpayment attributable to any taxes paid or accrued to any foreign country ... for which credit is allowed ..., in lieu of the 3-year period of limitation prescribed in subsection (a), the period [for filing the claim] shall be 10 years from the date prescribed by law for filing the return for the year with respect to which the claim is made."

affirmed the conviction and approved the jury instruction, focusing on the time of accrual of the foreign tax credit, which it equated to the point at which the amount of the foreign tax liability was "fixed":

> No proof ... was offered which indicated that Cruz fixed the amount of his foreign tax liability prior to trial. Only after the discovery of the deficiency and trial did Cruz fix the amount of his foreign tax liability. His after trial payment of the foreign tax liability cannot be used on appeal to overturn the conviction....  In this respect, the jury instruction given by the district court was correct. The instruction required that there be a firmly established taxable amount owed the foreign government and determined by it before the taxpayer would be entitled to a foreign tax credit. The practical effect of this decision means the tax evader can no longer play one government against the other to defeat an evasion prosecution.

*Id.* at 1152.  The Court recognized that 26 U.S.C. § 6511(d)(3)(A) provided for a ten-year window in which to claim the foreign tax credit, but found that "when the government begins a Section 7201 prosecution of a taxpayer who claims a foreign tax credit under Section 905,[12] the government accelerates the time within which the taxpayer may exercise the right to fix the amount of the foreign tax liability and claim the foreign tax credit."  *Id.*  A colorable reading of the Eleventh Circuit's opinion in *Cruz* is that a prosecution for tax evasion accelerates the time for fixing the amount of the foreign tax credit up until the time of trial.

---

[12]  26 U.S.C. § 905 sets out general rules governing the making of claims for credits against income taxes.

The Court in *Cruz* appeared to use the trial itself as the accelerated deadline for fixing the amount of the foreign tax credit.  The Court's language cited above, noting that no proof was offered that the defendant had fixed the amount of his foreign tax liability "prior to trial," and that his "after-trial payment of [his] foreign tax liability" could not be used on appeal to overturn his conviction, support this reading.  If this reading of *Cruz* is correct, it would imply that (at least in the Eleventh Circuit) determining and paying a foreign tax liability between the time of Indictment and the time of trial may put a tax evader in the position to undermine the government's proof of a tax deficiency.

Comparison of the present case to *Cruz* is instructive.  In *Cruz*, the defendant had filed no tax returns with the foreign sovereign.  *Id.* at 1150.  Defendant Tilga, by contrast, filed Canadian returns in August 2009.  See pages 3-4, above.  In *Cruz*, the defendant had not "fixed" his foreign tax liability by time of trial.  698 F.2d at 1152.  The Canadian Revenue Agency has assessed defendant Tilga, by contrast, CAN$7,424,514.40 in taxes on her Canadian income.  PSR at ¶¶ 82-83; Memorandum in Aid of Sentencing of Defendant Carolynne Tilga [Doc. 161] at 9, fn.19.  Defendant Tilga has accordingly positioned herself to take maximum advantage of whatever ambiguity has been created by the Eleventh Circuit's decision in *Cruz*.  Had this case gone to trial, the government expected that Tilga would have made aggressive use of *Cruz* and the foreign tax credit to attempt to show that there was no tax deficiency for any of the years in which she and Chandler were charged with tax evasion, that is, for the years 1999 to 2004.

Given the steps Tilga took to prepare herself to make aggressive use of the foreign tax credit as a defense at trial, and given the risk that the tax evasion counts for 1999 to 2004 may have fallen to this defense, the parties negotiated a plea that based upon the portion of the remaining count of the Indictment – the *Klein* conspiracy – and that focused on the one year for which the foreign tax credit was no longer available, namely, 1998. As explained above, by the time Tilga took steps to defend herself by use of the foreign tax credit, it was too late for her to claim the credit for that year. See page 4, n. 6, above. The parties accordingly agreed to a disposition under which the defendants would plead guilty to the conspiracy but the tax loss for guidelines purposes would be calculated as the loss for the year 1998 alone. That amount – $23,346.00 – was calculated by the means set out in the following footnote.[13]

In reaching a plea agreement that included a non-binding stipulation as to this loss amount, as well as imposing a series of obligations upon defendant Tilga that would not have been available to the government even had it prevailed at trial, the government obtained major count pleas by the two defendants, subjected defendant Tilga to exposure to a significant term of incarceration, obtained immediate payment of millions of dollars

---

[13] The Indictment alleged that Tilga and Chandler caused a wire transfer of $186,982.50 to be made from Cabernet Financial's offshore account at the Anglo-Irish Bank of Austria to Tierra del Taos Title Co., for the purchase of a home, on September 10, 1998. These funds constituted undeclared income for the year 1998. The income was derived from one of Tilga's Canadian businesses, in which she had previously made an investment of $50,000.00, and to which she had made a loan of approximately $20,252.00. She was entitled to recover her investment and loan before being taxed on the income. The remaining income of $116,730.50 should have been taxed at the then-prevailing long-term capital gain rate of 20 percent. The tax loss to the government was accordingly approximately $23,346.00.

in taxes, and deterred potential abusers of illegal tax shelters from future criminal conduct.  The government also avoided the risk and expense of a lengthy, complex international tax prosecution potentially requiring the use of cooperating criminal defendants who had either received reduced sentences for substantial assistance, or who had been fully immunized.  In addition, the government minimized the use of scarce judicial resources by reaching a plea agreement.  Moreover, the government avoided the risk of generating adverse legal precedent with respect to the defendants' proposed use of the foreign tax credit.

Finally, in considering the non-binding stipulated tax loss, the Court should consider a recent Tenth Circuit decision holding that a sentencing court does not abuse its discretion in considering well-supported but unclaimed tax deductions when calculating tax loss for purposes of U.S.S.G. § 2T1.1.  *United States v. Hoskins*, – F.3d – , 2011 WL 3528735 (10th Cir., August 12, 2011).

> Even if we accept that § 2T1.1 is directed at intended rather than actual tax loss, it does not follow that in proposing a more accurate determination, a defendant may *never* benefit from deductions that he could have claimed on the false tax returns. We, of course, agree ... that where a defendant offers weak support for a tax-loss estimate, nothing in the Guidelines *requires* a sentencing court to engage in the "nebulous and potentially complex exercise of speculating about unclaimed deductions."  *United States v. Yip,* 592 F.3d 1035, 1041 (9th Cir.2010). But where defendant offers convincing proof—where the court's exercise is neither nebulous nor complex—nothing in the Guidelines *prohibits* a sentencing court from considering evidence of unclaimed deductions in analyzing a defendant's estimate of the tax loss suffered by the government.

*Id.* at \*6.  While the present case involves unclaimed tax credits, rather than deductions, the government is not aware of a principled basis to deny the benefit of this holding to the defendants in this case.

Accordingly, the government requests that the Court give effect to the non-binding stipulation of the parties as to the loss amount for purposes of calculating the advisory sentencing guidelines under U.S.S.G. §§ 2T1.1 and 2T4.1.

**II.    The Court Should Impose a Custodial Sentence upon Defendant Tilga at the Top of the Advisory Guideline Range**

Defendant Tilga's PSR calculated that she had a total offense level of 10 and a guideline imprisonment range of 6 to 12 months.  Tilga PSR at ¶ 94.  A term of supervised release is optional if the Court imposes a term of imprisonment of one year or less.  Tilga PSR at ¶ 99.  Defendant Chandler's PSR calculated that his total offense level was 6, and that his guideline imprisonment range was 0 to 6 months.  Chandler PSR at ¶ 84.  Chandler is eligible for a sentence of probation for a period of between one and five years.  Chandler PSR at ¶ 93.

The United States requests that the Court impose a custodial sentence upon defendant Tilga at the top of the guideline range.  In the event that the Court adopts the guideline calculations of the PSR, that would mean a term of imprisonment of 12 months. The United States does not object to a sentence of probation for defendant Chandler.

In defendant Tilga's plea agreement, the United States specifically reserved the right to request that the Court impose a sentence at the top of the applicable guideline

range after the resolution of any objections to the Presentence Report and the

determination of the defendant's final adjusted offense level.  Tilga Plea Agreement at ¶

25.  The United States now makes that request.

This Court imposes criminal sentences on a daily basis upon defendants who are

poor, who are uneducated, whose upbringing left them unprepared for responsible

citizenship, who struggle with addiction, and who live in circumstances of violence and

uncertainty.  Defendant Tilga – wealthy, well educated, the product of a stable home,

physically healthy, and living a life of great privilege – could not be more different from

the typical defendant.  The advisory sentencing guideline imprisonment range applicable

to her is meant to be applicable to the range of defendants who come within the heartland

of offenders.  Tilga should be sentenced at the top of the applicable guideline range

because her conduct is the most egregious conceivable for similarly situated offenders,

motivated as if was by sheer greed in the face of conspicuous wealth.

Defendant Tilga's sentencing memorandum attaches testimonials from friends,

acquaintances and others.  Memorandum in Aid of Sentencing of Defendant Carolynne

Tilga [Doc. 161], filed October 6, 2011.  In her memorandum, Tilga moves for a

downward departure from her sentencing guideline range, and moves for a variance.  The

Court should deny these motions.  The fact that Tilga is a devoted mother is admirable,

but it does not distinguish her from the many other offenders with children whom this

18

Court sentences every day.[14]  While it is true that Tilga has never before been prosecuted criminally, this status is already accounted for in her Level One criminal history.  And her contention that she has suffered anguish and humiliation from this case does not distinguish her from any other White Collar defendant.  A sentence at the top of the applicable advisory guideline range would be sufficient but not greater than necessary to reflect the seriousness of the offense, promote respect for law, provide just punishment, and afford appropriate deterrence.  *Compare* 18 U.S.C. § 3553(a) (setting out factors to be considered in imposing sentence).

Tilga's sentencing memorandum cites five tax prosecutions in which defendants received non-custodial sentences despite having evaded millions of dollars in taxes.  Tilga Sentencing Memorandum at 15-18.  Tilga argues that she is similarly situated to these defendants, and accordingly that sentencing her to a non-custodial sentence would not create an undue sentencing disparity.  *Id.* at 18.  The imposition of a non-custodial sentence, however, would create an undue disparity from all the tax offenders whose crimes are within the heartland of the offense, and who are sentenced to terms of imprisonment within their applicable guideline ranges.  Tilga provides no information on which to make an informed judgment as to the basis of the non-custodial sentences imposed in the five cases she cites: it may well be that unusual circumstances in those cases justified those sentences.  Tilga's offense, however, is in the heartland of tax

---

[14]  The Court is doubtless concerned about the well-being of the defendants' children if a custodial sentence is imposed upon Tilga, but this concern should be alleviated if the Court imposes a non-custodial sentence upon defendant Chandler.

evasion offenses.  She does not present any basis for a downward departure.  Neither does she present a basis for a variance under the § 3553 factors.

In addition to a custodial sentence at the top of the applicable guideline range, the government requests that the Court impose a substantial fine upon Tilga.  Finally, the government requests that Tilga's obligations to participate in good faith in the IRS audit of her tax compliance, and to cooperate with such audit, as set out in her plea agreement at ¶ 15, be made a special condition of any supervised release or probation imposed.

As noted above, the government has no objection to a sentence of probation for defendant Chandler.  With respect to any fine to be imposed upon Chandler, the government recommends, in conformity with the promise it made in Chandler's plea agreement at ¶ 21, that the Court consider Chandler's role in the offense and the extent to which he has any independent income or independent sources of wealth.

## CONCLUSION

The United States respectfully requests that the Court give effect to the non-binding stipulated loss amount, impose sentence as requested herein, and grant such other relief as may be appropriate.

Respectfully submitted,

KENNETH J. GONZALES
United States Attorney

*Electronically filed*
*10/08/11*
JONATHON M. GERSON
Assistant United States Attorney
Post Office Box 607
Albuquerque, New Mexico 87103
(505) 346-7274

I HEREBY CERTIFY that a true and correct copy
of the foregoing pleading was electronically served
on all counsel of record upon this 8th day of October,
2011, via the Court's CM/ECF automated filing system.

*Electronically filed*
*10/08/11*
Jonathon M. Gerson
Assistant United States Attorney

21