IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                                                                                                                           No. CR 09-0865 JB

CAROLYNNE TILGA and
MICHAEL CHANDLER,

    Defendants.

**MEMORANDUM OPINION AND ORDER**

    **THIS MATTER** comes before the Court on Defendant Michael Chandler's Sentencing Memorandum and Request for a Reasonable Sentence, filed August 23, 2011 (Doc. 154)("Chandler Sentencing Memorandum"). The Court held a sentencing hearing on January 13, 2012. The primary issue is whether the Court should sentence Defendant Michael Chandler to a sentence of probation. The Court will deny the request for a sentence of probation and will instead sentence Chandler to 1 day or time served, whichever is shorter, and two-years of supervised release, with home detention and electronic monitoring for a period of 6 months. The Court will also order that Chandler pay a fine of $665.41.

**FACTUAL BACKGROUND**

    Chandler was born in Boston, Massachusetts. See Presentence Investigation Report (disclosed July 26, 2011)("PSR"). Chandler "witnessed the domestic abuse of his mother at the hands of his biological father." Sentencing Memorandum at 2. Chandler attended Boston College and Plymouth State University, but did not graduate from either. See PSR ¶¶ 65-66, at 21. He has two daughters, who are eleven and nine years old. See PSR ¶ 54, at 19. He asserts that he

"struggled and overcame addiction to alcohol." Sentencing Memorandum at 2. See PSR ¶¶ 58-62, at 20-21. Chandler is a "stay-at-home dad" and works for Taos Ski Academy as ski instructor. See PSR ¶ 68, at 22. He is his daughters' ski coach. See PSR ¶ 68, at 22. His reported adjusted gross income each year from 2006 to the last available return in 2009 was less than $10,000.00. See PSR ¶ 81, at 26. Chandler's "yearly income is very limited and he is almost completely reliant on his wife's income." PSR ¶ 82, at 27.

Chandler, and his wife and co-Defendant, Carolynne Tilga, owned and controlled various businesses, including internet service sites, from 1998 to 2006. See PSR ¶ 9, at 4. Between 1999 and 2004, Tilga owned and operated an adults-only internet dating service. See PSR ¶ 17, at 7. Before 2002, Tilga was a partner with two Canadian businessmen, and the internet service sites were located in Canada. See Tilga PSR ¶ 17, at 7. Tilga earned income from the Canadian joint venture, in which she owned a 37.5% share, as part of her trade and business between the tax years 1999 and 2004. See Memorandum Opinion and Order at 3, filed November 08, 2011 (Doc. 165)("MOO"). After 2002, Tilga expanded the company on her own, using webcam[1] sites in addition to the standard internet dating sites with which she was working. See MOO at 3.

Tilga was introduced to the Commonwealth Trust Company ("CTC") in 1998.[2] See PSR

---

[1] A webcam is a video camera that feeds its images in real time to a computer or computer network, often via USB, ethernet, or Wi-Fi. The name, webcam, is derived from their common use as a video camera for the World Wide Web, or internet. Webcams are frequently used to establish video links, permitting personal computers to act as video-phones or video-conference stations. See Webcam, Wikipedia.org, http://en.wikipedia.org/wiki/Webcam (last visited July 19, 2012).

[2] CTC marketed their services and products as a means of providing privacy and asset protection. See PSR ¶ 11, at 5. CTC described privacy as "a means to get assets out of your name" and asset protection as "a method to owe more than the asset is worth." PSR ¶ 11, at 5. The CTC provided clients with documentation from the Internal Revenue Service ("IRS") that Pure Trust Organizations ("PTOs") were considered legal, even though they did not have to file income tax returns. PSR ¶ 11, at 5. When a client purchased a CTC product, such as a Pure Trust Organization,

¶ 16, at 6.  The CTC was an organization[3] that taught individuals how to purchase and manage Pure Trust Organizations ("PTOs").[4]  See PSR ¶ 10, at 4.  Tilga began purchasing entities from CTC around April 1998.  See PSR ¶ 16, at 6.  Each of these entities was a "business" that controlled Tilga's internet sites, her homes, and her vehicles.  PSR ¶ 16, at 6.  Chandler did not use his personal

---

the client would receive the original documents, and CTC would inform the client that the documents should be stored away from the client's personal residence.  See PSR ¶ 13, at 5.  This off-site storage occurred because if the IRS were to locate the documents, it would confirm that the PTOs were an alter ego of the client who purchased the product.  See PSR ¶ 13, at 5.  The Director of Operations of CTC from 1998 to 2003, Wayne C. Rebuck, knew that the majority of pure trusts sold by CTC were used in an abusive manner, wherein individuals "evaded and defeated taxes."  PSR ¶ 14, at 5-6.

[3]Although it is unclear whether the CTC still operates as an organization, the PSR refers to it in the past tense, and it appears that CTC's Director of Operations, Wayne C. Rebuck, has been involved in this and other criminal prosecutions.  See PSR ¶ 15, at 6 ("Rebuck was able to identify Carolynne Tilga and Michael Chandler as individuals who met with representatives from CTC to purchase trusts and foreign companies."); United States v. Anthony, 545 F.3d 60, 63 n.4 (1st Cir. 2008)("Pursuant to an agreement with the government [Wayne] Rebuck testified at Anthony's trial.").

[4]The PSR notes:

> A Pure Trust Organization (PTO) has been defined as a common law contract in trust form.  The Pure Trust is a contract at common-law in equity created in trust form.  Unlike the Trust, the PTO receives the assets by exchange, meaning there is a full and adequate exchange for the assets.  In other words each party gives something and receives something in return, and the agreement has a stipulated duty to perform that all parties must adhere to.  The Exchanger exchanges the assets to the Trust for Trust Certificate Units ("TCU's").  The Creator appoints at least two Trustees to manage the trust.  The Trustees can appoint a General Manager to oversee the day-to-day business activities of the Trust.  The Exchanger has no control over the Trustees, the business of the Trust or the income stream.  The Trustees are in total control and the Exchanger has no reversionary interest in the Trust.  This entity has the substance of a contract and the form of a trust.

PSR ¶ 10, at 4-5.  The IRS states that the term "pure trust" does not appear in the Internal Revenue Code and that "[w]hatever the name of the arrangement . . . the taxation of the entity must comply with the requirements of the Internal Revenue Code."  Abusive Trust Tax Evasion Schemes - Special Types of Trusts, Internal Revenue Service, http://www.irs.gov/businesses/small/article/0,,id=106553,00.html (last visited July 19, 2012).

-3-

income to purchase any entities from CTC, but he assisted Tilga in her business ventures and was aware of the nature of CTC's services. See PSR ¶ 16, at 6. Between 1998 and 2003, Tilga purchased the following entities from CTC: (i) Cabernet Financial, 1998; (ii) Worldwide Communications, 1998; (iii) General Management Services, 1998; (iv) Bressingham Investments, 1998; (v) Astra Management, 1999; (vi) Vantage Global, 2001; (vii) Batavia Guild Group, 2002; (viii) Triad Universal, 2002; (ix) Alsacia Marketing Services, 2002; and (x) Enchantment Property Management, 2003. See PSR ¶ 16, at 6-7.

Tilga requested that the revenue from her Canadian business be generated to Cabernet Financial, which used an offshore trust account. See PSR ¶ 18, at 7. Tilga paid no taxes on her share of the revenues received from her Canadian business. See PSR ¶ 18, at 7. Tilga then transferred funds from Cabernet Financial to various other entities purchased from CTC, which were formed to allow Tilga to purchase real estate and vehicles. See PSR ¶ 18, at 7.

An IRS investigation revealed that Tilga and Chandler used the CTC trusts and offshore companies to purchase assets and set up new offshore accounts. See PSR ¶ 19, at 7. Between 1999 and 2004, Tilga wired nearly $8.7 million (USD) into the United States from her offshore accounts, but her tax returns usually reported less than $75,000.00 (USD) in income per year. See PSR ¶ 19, at 7. Tilga and Chandler used those funds to purchase expensive real estate in New Mexico, Colorado, and Hawaii. See PSR ¶ 19, at 7-8. Chandler assisted Tilga in wiring money to and from the accounts. See PSR ¶ 22, at 9-10. Chandler also rented mailboxes for two CTC entities: (i) Worldwide Communications; and (ii) Cabernet Financial. See PSR ¶ 22, at 10. Chandler understood that the purpose of moving the money through the trusts was to prevent showing personal income on which he would have a tax liability. See Plea Agreement ¶ 7(a), at 3. Chandler also purchased a Lexus and titled it in the name of General Management Services, a CTC entity.

See PSR ¶ 7(e), at 4.

For the years 1999 to 2004, Tilga failed to report $5,201,064.00 (USD) in taxable income. See PSR ¶ 25, at 11. Additionally, neither Tilga nor the vast number of CTC entities that she owned filed tax returns. See PSR ¶ 26, at 11. Accordingly, the IRS calculated the additional taxes due and owing for those years was $1,937,272.00 (USD). See PSR ¶ 26, at 12.

## PROCEDURAL BACKGROUND

A federal grand jury indicted Defendant Michael Chandler for a Klein conspiracy[5] to defeat the administration of the tax laws of the United States during the period 1998 to 2006 in violation of 18 U.S.C. § 371 and with tax evasion for the years 1999 to 2004 in violation of 26 U.S.C. § 7201. See Redacted Indictment, filed April 9, 2009 (Doc. 2)("Indictment"). On January 6, 2011, Chandler pled guilty to the Klein conspiracy. See Plea Agreement ¶ 3, at 2. In his Plea Agreement, Chandler waived his right to appeal any sentence at or under the maximum statutory penalty authorized. See Plea Agreement ¶ 19, at 8. Chandler admits that Tilga requested his assistance in using a number of off-shore trusts through which they would move money and that agreed to assist in using the off-shore trusts for these purposes. See Plea Agreement ¶ 7(a), at 3. Chandler also agreed that the Court could rely on any of the facts in the Plea Agreement, "as well as facts in the presentence report, to determine his sentence, including, but not limited to, the advisory guideline offense level." Plea Agreement ¶ 8, at 4. The parties stipulate that the offense did not involve a breach of trust,

---

[5]A conspiracy to defeat the Internal Revenue Services' lawful function and victimize the IRS is known as a Klein conspiracy. See United States v. Adkinson, 158 F.3d 1147, 1154 (11th Cir. 1998)(citing United States v. Klein, 247 F.2d 908 (2d Cir. 1997)). To show a Klein conspiracy the United States must show not only (i) the requisite act of a failure to properly report income, but also (ii) an agreement between at least two conspirators to impede the IRS' functioning and (iii) knowing participation in such a conspiracy. See United States v. Adkinson, 158 F.3d at 1153; United States v. McKee, 506 F.3d 225, 238 (3d Cir. 2007).

special skill, sophisticated means, an aggravating role, or obstruction of justice. See Plea Agreement ¶ 9(b), at 5. The United States also agrees that, with respect to any fine, it will recommend that the Court consider Chandler's role in the offense and the extent to which Chandler has any independent income or sources of wealth. See Plea Agreement ¶ 21, at 9.

The United States Probation Office ("USPO") disclosed a PSR for Chandler on July 26, 2011. The PSR notes that Chandler served 1-day imprisonment on April 23, 2009. See PSR at 1. The USPO calculates that Chandler has a base offense level of 12, based on U.S.S.G. § 2T1.9(a)(1). See PSR ¶ 36, at 15. The PSR then applies a 4-level reduction based on Chandler's minimal role pursuant to U.S.S.G. § 3B1.2. See PSR ¶ 39, at 16. The USPO also applies a 2-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1. See PSR ¶ 43. The PSR calculates that Chandler has a total offense level of 6. See PSR ¶ 44, at 17. The USPO calculates that Chandler has a criminal history category of I, based on 0 criminal history points. See PSR ¶ 47, at 18. A total offense level of 6 and a criminal history category of I, establishes a guideline imprisonment range of 0 to 6 months. See PSR ¶ 84, at 27. After Tilga filed objections to the PSR, the Court entered a memorandum opinion and order. See Memorandum Opinion and Order, file November 8, 2011 (Doc. 165)("MOO"). In its MOO, the Court determined that the tax-loss calculation for the conspiracy was $23,200.00 and that Tilga and Chandler used sophisticated means to commit the offense. See MOO at 1. The Court accepted the parties' stipulations that the offense did not involve a special skill, aggravating role, or obstruction of justice. See MOO at 1. With the 2-level sophisticated-means enhancement pursuant to U.S.S.G. § 2T1.1, see MOO at 59, Chandler now has a total offense level of 8, but his guideline imprisonment range remains at 0 to 6 months.

In the Chandler Sentencing Memorandum, Chandler requests a "reasonable sentence in light of United States v. Booker, 543 U.S. 220 (2005) and 18 U.S.C. § 3553(a)." Chandler Sentencing

Memorandum at 1. Chandler states that he is a fifty-two-year old, long-time resident of New Mexico. See Chandler Sentencing Memorandum at 1. He asserts that, as a young child, he lost his right eye to Coats' Disease,[6] that he witnessed the domestic abuse of his mother at the hands of his father, and that, as a young adult, he overcame an alcohol addiction. See Chandler Sentencing Memorandum at 2. He argues that he is devoted to his family and that a period of incarceration will result in irreparable trauma to his two daughters. See Chandler Sentencing Memorandum at 2. He asks that the Court impose a sentence of probation. See Chandler Sentencing Memorandum at 2. While Chandler admits that he committed a serious offense, he contends that his involvement was minimal and out of character. See Chandler Sentencing Memorandum at 4. He emphasizes that any sentence of imprisonment would serve no legitimate purpose. See Chandler Sentencing Memorandum at 4. He argues that this was aberrant behavior, committed without significant planning. See Chandler Sentencing Memorandum at 6. Chandler also emphasizes the extraordinary efforts at restitution that he and Tilga have made. See Chandler Sentencing Memorandum at 6. He asserts that he has devoted his "entire existence to his wife and daughters," and that a sentence of probation is appropriate because of his family ties and responsibilities. Chandler Sentencing Memorandum at 8. He argues that a sentence of probation would address all of the 18 U.S.C. § 3553(a) factors.

Plaintiff United States of America filed its Government's Sentencing Memorandum on October 8, 2011. See Doc. 162 ("USA Sentencing Memorandum"). The United States "does not object to a sentence of probation for defendant Chandler." USA Sentencing Memorandum at 17.

---

[6]Coat's disease is a "very rare, congenital, nonhereditary eye disorder, causing full or partial blindness, characterized by abnormal development of blood vessels behind the retina." Coats' Disease, Wikipedia.org, http://en.wikipedia.org/wiki/Coats%27_disease.

On January 13, 2012, the Court sentenced Tilga to 8-months imprisonment and 2-years supervised release. See Judgment in a Criminal Case at 2-3, filed April 5, 2012 (Doc. 183)("Tilga Judgment"). The Court also imposed a $56,141.88 fine. See Tilga Judgment at 3.

The Court held a hearing on January 13, 2012. The Court clarified that Chandler had withdrawn an earlier objection[7] to the PSR and Chandler confirmed that he had. See Transcript of Hearing at 2:11-14 (January 13, 2012)(Court, Johnson)("Tr.").[8] Chandler requested that the Court sentence him to a period of probation. See Tr. at 12:5-6 (Johnson). He emphasized that the Court had sentenced Tilga to 8-months in prison, and that his daughters would need him to assist with their home-schooling and to take over the primary caregiver role. See Tr. at 12:9-15 (Johnson). He argued that there is no one else to care for his children. See Tr. at 12:23-13:2 (Johnson). He asked that his probation be unsupervised, because he does not post any danger to the community. See Tr. at 13:6-10 (Johnson). He asserted that this business was Tilga's and that he has no criminal history other than a twenty-six year old misdemeanor conviction. See Tr. at 13:10-13 (Johnson). He also noted the adversity he has overcome as stated in the Chandler Sentencing Memorandum. See Tr. at 14:12-23 (Johnson). The United States asserted that it would not oppose a sentence of probation. See Tr. at 15:1-4 (Gerson). It stated that it would object to a sentence of one-year unsupervised probation, because such a sentence does not adequately reflect the seriousness of his offense. See Tr. at 15:5-8 (Gerson). It asked that the Court make probation supervised and impose a five-year

---

[7]On August 31, 2011, Chandler filed Defendant Michael Chandler's Objection to the Presentece Report. See Doc. 156 ("Objection"). Chandler objected to paragraph 22 of the PSR which states that "Chandler was also known to assist wiring money to and from the account." Objection at 1. On September 14, 2011, Chandler filed Defendant Michael Chandler's Notice of Withdrawal of Objection to Pre-Sentence Report (PSR)(Doc. 156). See Doc. 159.

[8]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

term of probation. See Tr. at 15:8-10 (Gerson). It emphasized that supervision was important, given the tremendous loss of income that his family was facing and to ensure that Chandler does not end up in arrears on any outstanding debts. See Tr. at 15:10-18 (Gerson). In conformance with the Plea Agreement, the United States asserted that, to the extent the Court is considering a fine, the Court should consider Chandler's role in the offense and the extent to which he has independent income. See Tr. at 15:19-16:2 (Gerson). Chandler requested that the Court not impose a fine given that, because of Tilga's imprisonment, his family is about to lose its sole source of income. See Tr. at 16:3-10 (Johnson). He emphasized that, because Tilga was sentenced to a term of imprisonment, he will be a stay-at-home dad and will be unable to take on work as a ski instructor. See Tr. at 16:11-16 (Johnson). He also asked that the Court not impose a period of community service, because his daughters are home-schooled. See Tr. at 16:21-17:6 (Johnson).

## ANALYSIS

The Court will sentence Chandler to 1-day imprisonment or time-served, whichever is less, and to 2-years supervised release with a six-month period of electronic monitoring. The Court will also impose a $665.41 fine on Chandler reflecting some of the costs that he has and will impose on the United States.

The Court will accept the Plea Agreement in this case, with the exception of the stipulation that the sophisticated-means enhancement does not apply. See MOO at 1-2. There being no objections to the PSR's factual findings or guideline application, the Court will adopt them as its own. The Court has considered the factors set forth in 18 U.S.C. § 3553(a). The total offense level is 6 and the criminal history category is I. The guideline imprisonment range is 0 to 6 months. The Court notes that Chandler conspired with others to evade payment of taxes owed to the United States.

The Court has carefully reviewed the parties' arguments and the circumstances of this case. The Court has considered the guidelines, but in arriving at its sentence the Court has taken into account not only the guidelines, but other sentencing goals. Specifically, the Court has considered the guideline range for the applicable category of offense committed by the applicable category of defendant. The Court believes that the punishment that the guidelines set forth is appropriate for Chandler. The Court then considered the kind of sentences and ranges established by the guidelines. The Court notes that Chandler served 1-day imprisonment on April 23, 2009, such that, while the Court is comfortable with not imprisoning Chandler further, it would be more appropriate to give him credit for time served and impose conditions of supervised release, than give him probation. Accordingly, the Court will sentence Chandler to 1-day imprisonment or time served, whichever is less, and a two-year term of supervised release. The Court believes that 1 year of supervised release is insufficient given the seriousness of the crime that Chandler committed. The Court believes that this term should be supervised and will require that Chandler submit to 6 months of electronic monitoring, a period that is roughly equivalent to the period of imprisonment that Tilga will serve. The Court agrees that Chandler needs to be the primary caregiver for his daughters and will not require that he complete community service. The Court finds that it would be inappropriate to incarcerate Chandler, because it would not further any of the 18 U.S.C. § 3553(a) factors and would leave his daughters without any family members to care for them.

The Court finds that this sentence is more just than one of further incarceration. The Court believes that a term of electronic monitoring is necessary not only to deter Chandler, but to deter the general public. The Court believes that requiring electronic monitoring will reinforce to the public that tax evasion is a serious crime which carries consequences. Additionally, because this sentence is a guideline sentence, the Court concludes that it avoids unwarranted sentencing disparities among

-10-

defendants with similar records who have been found guilty of similar conduct. Although the Court is concerned with the role that Chandler played in this conspiracy and whether it truly knows the extent of his involvement, the Court believes that the term of supervised release adequately captures that role and helps to avoid unwarranted disparities. The Court ordinarily imposes a term of supervised release when sentencing is in this range, and the Court sees no reason to vary from that practice here. Because the Court will impose a term of supervised release, the Court believes that this sentence will provide Chandler with some needed education and training to prevent him from committing a similar crime in the future. The Court also believes that there should be some equivalence between the time that Chandler and Tilga serve on supervised release, and so the Court has now sentenced them both to two-years of supervised release. The term of electronic monitoring will not be the same length as Tilga's term of imprisonment, because the Court agrees with the United States and Chandler that he is less culpable and should be in the home. Because Chandler will be the primary caretaker for his daughter's while on electronic monitoring, the Court will permit him to drive his daughters to extracurricular activities or appointments, and to go to the grocery store, and will not require that he maintain full-time employment as a condition of release.

The Court will also order that Chandler pay a fine of $665.41. The fine range for an offense level 6 is $500.00 to $5,000.00. The PSR calculates Chandler's net worth as $765.41. See PSR ¶ 72, at 23. Subtracting the $100.00 special assessment leaves $665.41 and the Court will impose a fine reflecting that amount. The Court believes that, given the offense Chandler committed and the lifestyle that Chandler lived, a fine is appropriate. The Court is cognizant that Chandler's net worth and assets are very different from Tilga's. Chandler appears able to pay this fine, however, and the fine is not so great that it will significantly impact Chandler's finances.

This sentence fully and effectively reflects each of the 18 U.S.C. § 3553(a) factors. While

the Court's task, as a district court, is not to arrive at a reasonable sentence -- it is to come up with one that reflects the factors in 18 U.S.C. § 3553(a), see United States v. Conlan, 500 F.3d 1167, 1169 (10th Cir. 2007)("[A] district court's job is not to impose a reasonable sentence. Rather, a district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2)." (citation omitted)) -- the Court believes this sentence is reasonable. And perhaps most important in this calculation, the Court believes that this sentence is sufficient without being greater than necessary to comply with the purposes of punishment Congress set forth in the Sentencing Reform Act of 1984, Pub. L. No. 98-473, 98 Stat. 1987 (codified as amended in scattered sections of 18 U.S.C.). The Court will sentence Chandler to 1-day imprisonment or time served, whichever is less, and to two-years supervised release with a six-month period of electronic monitoring. The Court will also order that Chandler pay a $665.41 fine.

**IT IS ORDERED** that the request for a sentence of probation in Defendant Michael Chandler's Sentencing Memorandum and Request for a Reasonable Sentence, filed August 23, 2011 (Doc. 154), is denied. The Court will sentence Chandler to 1-day imprisonment or time served, whichever is less, and to two-years supervised release with a six-month period of electronic monitoring. The Court will also order that Chandler pay a $665.41 fine.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Joseph M. Giannullo
United Stated Department of Justice
Washington, D.C.

--*and*--

Kenneth J. Gonzales
  United States Attorney
Jonathon M. Gerson
Paula G. Burnett
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson, LLC
Albuquerque, New Mexico

    *Attorney for the Defendant*